<u>NOT FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

**FILED**

JAMES J. WALDRON, CLERK

January 20, 2011

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: s/Elizabeth Grassia, Deputy

|  |  |
|---|---|
| IN RE: | CHAPTER 11 |
| MEDFORD CROSSINGS NORTH, LLC., et al., | CASE NOS. 07-25115; 07-25121; 07-25124; 07-25125; 07-25126; 07-25127, 07-25129, 07-25131, 07-25133, 07-25135, 07-25587; and 07-25591 |
| Debtors. | |
| | (Jointly Administered Under Case No. 07-25115 (GMB)) |
| | <u>MEMORANDUM OPINION</u> |

<u>APPEARANCES</u>:

Courtney A. Schael, Esquire
ASHFORD-SCHAEL, LLC
511 Summit Avenue
Westfield, NJ 07090
Attorneys for the Debtors

Michael J. Shavel, Esquire
D. Andrew Bertorelli, Jr., Esquire
SPECTOR, GADON & ROSEN, P.C.
1000 Lenola Road, Suite 203
Maple Shade, NJ 08052
Attorneys for Medford Village East Associates, LLC
    and Laurel Pines, LLC

Trent S. Dickey, Esquire
Valerie A. Hamilton, Esquire
SILLS, CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, NJ 07102
Attorneys for Ripco Ventures, Inc.

Donald Campbell, Jr., Esquire
Paul H. Schneider, Esquire
GIORDANO, HALLERAN & CIESLA, P.C.
P.O. Box 190
Middletown, NJ 07748
Attorneys for U.S. Home Corp., d/b/a Lennar Homes

Stephen D. Samost
479 Centennial Boulevard
Voorhees, NJ 08043

Oren Klein, Esquire
PARKER McCAY, P.A.
Three Greentree Centre
7001 Lincoln Drive West
P.O. Box 974
Marlton, NJ 08053-3292
Attorneys for Township of Medford

Jeffrey Sponder, Esquire
Office of the U.S. Trustee
One Newark Center
Suite 2100
Newark, NJ 07102

Robert M. Greenbaum, Esquire
SAUL EWING, LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Attorneys for Cubellis, Inc.

Derrick R. Frejomil, Esquire
RIKER, DANZIG, SCHERER, HYLAND &
    PERETTI, LLP
One Speedwell Avenue
Morristown, NJ 07962-1981
Attorneys for Freedman Cohen Development, LLC;
FC Development, LLC; and Carl Freedman

Stephen McNally, Esquire
CHIUMENTO, McNALLY & SHOCKLEY, LLC
Cherry Tree Corporate Center
535 Route 38 East, Suite 360
Cherry Hill, NJ 08002
Attorneys for Pennoni Associates

I.    <u>INTRODUCTION</u>[1]

Before the Court are Motions for Directed Verdict Filed by Stephen D. Samost, on behalf

of Laurel Pines, LLC ("Laurel"), Medford Village East Associates, LLC ("MVE"), Stephen D.

Samost ("Samost" and collectively with Laurel and MVE, the "MVE Litigants"), U.S. Home

Corp., d/b/a Lennar Homes ("Lennar") and Cubellis, Inc. ("Cubellis" and collectively with MVE

Litigants and Lennar, the "Movants"), asking this Court to find that the Third Amended Plan of

Reorganization of Medford Crossings North LLC (07-25115) ("MCN"), Medford Crossings

South LLC (07-25121) ("MCS"), Purple Tree One LLC (07-25124), Purple Tree Two LLC (07-

25125), Purple Tree Three LLC (07-25126), Purple Tree Four (07-25127), Purple Tree Five (07-

25129), Purple Tree Ten LLC (07-25131), Purple Tree Investments LLC (07-25133) (collectively

the "Purple Tree Entities"), FC Medford Residential LLC (07-25135) ("FCMR"), Medford

Crossings North Urban Renewal LLC (07-25587) and Medford Crossings South Urban Renewal

LLC (07-25591) (the "CUREs") (MCN, MCS, Purple Tree Entities, FCMR and CUREs

collectively referred to herein as the "Debtors") under chapter 11 of title of 11 of the United

States Code (the "Bankruptcy Code") dated September 29, 2008, is unconfirmable.

The cases have a long and tortured history displaying continuous animosity among the

parties and contentiousness in each and every matter.  While the Debtors originally expressed a

desire to reorganize and complete the pending construction project, more fully described below,

it soon became apparent that a plan of liquidation was the only available avenue.  A liquidating

plan and disclosure statement were filed on April 14, 2008, an amended plan and disclosure

statement filed on June 13, 2008 and a Third Modified Plan and Third Modified Disclosure

---

[1]  Unless expressly noted otherwise, all capitalized terms not defined herein shall have the meanings ascribed to
them in the Third Amended Plan of Reorganization or the Disclosure Statement.

3

Statement were filed on September 29, 2008 (the "Third Modified Plan" or the "Plan" and the

"Third Modified Disclosure Statement" or the "Disclosure Statement"). The Disclosure

Statement was approved by order dated October 28, 2008 and amended order dated October 31,

2008 and confirmation was originally scheduled for December 19, 2008. Objections to the Plan

were filed by Lennar, Cubellis, MVE, Laurel, Pennoni Associates, Inc. ("Pennoni") and Medford

Township (the "Township"). The objection of Pennoni and the Township were resolved prior to

the hearing on confirmation and the remaining objections continued through a contested

confirmation hearing which took place over many hearing dates spanning months. The

confirmation hearing commenced on January 29, 2009 and testimony concluded on July 16,

2009. The parties then spent several weeks attempting to agree on the admissibility of the

volumes of documents. The Court held a hearing on the exhibits whose admissibility were still

disputed on August 13, 2009 resulting in an order dated November 20, 2009 which specifically

identified each admitted document. On September 4, 2009, MVE, Laurel, Samost and Cubellis

filed the Motions for Directed at issue, all seeking a determination that the Bankruptcy Court

lacked jurisdiction to approve the releases and injunction contained in the Debtors'(collectively

referred to herein as the "Motions for Directed Verdict"). The Court took these matters under

advisement to make findings of fact and conclusions of law as to whether the Debtors had met

their burden to show that the proposed Plan was confirmable.[2]

---

[2] Federal Rule of Civil Procedure 50(a), which is incorporated into bankruptcy cases through Federal Rule of
Bankruptcy Procedure 9015(a), does not allow for motions for directed verdict outside the context of a jury trial.
See *Rego v. ARC Water Treatment Co. of Pennsylvania*, 181 F.3d 396, 401 (3d Cir. 1999) ("Rule 50(a) applies in
jury trials and Rule 52(c) applies in non-jury trials."). Since the Debtors' confirmation hearing is not a jury trial, the
Court will view the Motions for Directed Verdict as motions filed pursuant to Federal Rule of Civil Procedure 52(c),
which is incorporated into bankruptcy cases through Federal Rule of Bankruptcy Procedure 7052.

Federal Rule of Civil Procedure 52(c), which is entitled "Judgment on Partial Findings," provides in pertinent
part that:

II.    FINDINGS OF FACT[3]

A.    Background

On October 17, 2007, MCS, MCN, the Purple Tree Entities and FCMR filed Chapter 11

petitions in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy

Court"). An order providing for joint administration of the cases was entered on October 23,

2007. On October 25, 2007 the CUREs also filed chapter 11 petitions which were ordered to be

jointly administered with the previously filed cases by order dated December 4, 2007. Since the

filing of its bankruptcy petitions, the Debtors have been operating as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

MCN was formed on October 12, 2004 and MCS was formed on October 22, 2004 in

accordance with Certificates of Formation filed with the New Jersey Department of Treasury on

October 13, 2004 and October 25, 2004, respectively. Limited liability agreements dated

October 22, 2004 provide for initial contributions and additional capital contributions by the

members as may be needed to accomplish the business purposes of the company. The members

of MCN are Medford Crossings North Development Associates LLC and Ripco Ventures, Inc.

("Ripco"). The members of MCS are Medford Crossings South Development, South Associates

---

> If a party has been fully heard on an issue during a nonjury trial and the court
> finds against the party on that issue, the court may enter judgment against the
> party on a claim or defense that, under the controlling law, can be maintained or
> defeated only with a favorable finding on that issue. The court may, however,
> decline to render any judgment until the close of the evidence.

"Federal Rule of Civil Procedure 52(a) dictates the appropriate standard of review." *Newark Branch, NAACP v. City of Bayonne*, 134 F.3d 113, 119 (3d Cir. 1998). Pursuant to Rule 52(a), a court "must find the facts specially and state its conclusions of law separately." The following constitutes this Court's findings of fact and conclusion of law.

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

LLC and Ripco.  Mitchell R. Cohen ("Cohen") signed both agreements on behalf of Medford

Crossings North Development Associates LLC and Medford Crossings South Development LLC

and Christopher Conlin ("Conlin") signed both documents on behalf of Ripco.  Despite both

agreements stating that Schedule I attached to the agreements describes the amount of initial

contribution of the members, Schedule I attached to the LLC agreement of MCN has no amount

listed and the LLC agreement of MCS has no schedule I attached.  Although the agreements are

dated October 22, 2004, they both reference an agreement of sale with Medford Township,

assignment of rights to Purple Tree Investment LLC, which was formed in 2006, and an

agreement of sale with Lennar which was executed in 2006, clearly indicating that the

agreements could not have been executed in 2004, and the debtors provided no explanation for

the discrepancy.

The Purple Tree Entities were each formed on May 5, 2006 pursuant to the amended and

restated Limited Liability Agreements submitted into evidence.  FCMR and Ripco were the

members of each of these entities.  Each agreement also provides for initial contributions as set

forth on Schedule I but none of the agreements has a Schedule I attached.  Purple Tree

Investments LLC was also formed on or about May 5, 2006 pursuant to an amended and restated

limited liability agreement, of which FCMR and Ripco were members.  Schedule I is attached to

the limited liability agreement, but it reflects no amount of initial capital contribution.

Mitchell R. Cohen signed each agreement on behalf of FCMR and Christopher Conlin signed on

behalf of Ripco.

FCMR was formed on May 2, 2006 pursuant to a limited liability agreement.  Mitchell

Cohen, Carl Freedman, Mark Arencibia and Scott Ciocco are identified as members, but only

Mitchell Cohen and Carl Freedman signed the limited liability agreement.  Schedule I attached to

the agreement purports to identify the amount of initial capital contributions, but the amounts are

left blank for Freedman and Cohen and are zero for Arencibia and Ciocco.  No limited liability

agreements were presented relating to the formation of Medford Crossings North Urban Renewal

LLC ("MCN Urban Renewal") or Medford Crossings South Urban Renewal LLC ("MCS Urban

Renewal"), collectively the CUREs.

 The purpose of the formation of the various Debtor entities was the completion of a

development project located on Route 70 in Medford Township, now known as Medford

Crossings (the "Project"). The Project was ongoing for many years prior to the involvement of

the Debtors and their principals, and extensive litigation was involved.  Samost, an attorney and

developer, was involved with the Project since its inception. The land in question was purchased

at various times and by various entities owned and/or controlled by Samost in the mid-1980's.

The properties were eventually transferred to Medford Village East Associates, LLC ("MVE"),

an entity owned and controlled by Samost.  MVE is a creditor in this case and objects to the

proposed plan of reorganization.

 In late 2003 and early 2004 Cohen and Carl Freedman ("Freedman") negotiated with

Samost for the right to acquire and develop the property, which included both commercial and

residential portions, and spanned both north and south of Route 70 in Medford Township (the

"Property").  Freedman met Samost through a mutual friend and they became friendly.

Freedman was aware of the extensive litigation involving this project but he believed that he

could be part of the solution to the problems which existed regarding the development.  He felt it

unnecessary to look into the details of the past litigation as it was his intention to move forward

with the project.  Freedman and Cohen were members of an entity known as Freedman Cohen

Development LLC ("FCD").  Freedman alleges that Samost represented that all of the necessary

permits were "substantially in place".  Freedman, on behalf of the Debtors MCN and MCS

engaged in due diligence regarding this Project which included the retention of Pennoni, an

engineering firm, at a cost of a million dollars or more.  Despite this intensive due diligence,

Freedman alleges that he later learned that Samost's representations regarding the status of

permits was untrue.

On or about March 29, 2005 a memorandum of understanding (the "MOU") was prepared

by Phillip B. Caton, PP, AICP and Court Appointed Master in the MVE Litigation, and

circulated and signed by parties to the transaction including the Township, Samost and Freedman

which provided for the development of the Project by "Freeco", which is identified in the

document as Medford Crossings South LLC c/o Freedman Cohen Development, LLC.  This

agreement provided revised final subdivision and site plans, affordable housing units, the

construction of recreational and library/municipal buildings by Freeco, the development of the

commercial areas by Freeco, the purchase of all the residential lands to Pulte Homes of New

Jersey ("Pulte"), and the purchase of all of the commercial and civic use lands to Freeco for

$24,000,000.  The MOU signed by counsel for the Township, the Medford Township Planning

Board and Samost recited that a stipulation of settlement would be executed by the parties within

thirty (30) days.  It is clear from the document that Mr. Freedman participated in negotiating the

terms of the MOU and was aware of the terms, despite the lack of a signature on behalf of

Freeco, FCD, or the Debtors.

A stipulation of settlement followed, which was signed on behalf of the Debtors by their

counsel as well as the Medford Township Planning Board, Medford Township, Samost and Pulte

(the "Stipulation of Settlement"). In the Stipulation of Settlement[4], the proposed developer of

MCN and MCS is identified as Freeco. The Stipulation of Settlement includes many of the

provisions of the MOU, provides that prior orders of the Court are modified by the MOU, the

Stipulation of Settlement and any other agreement executed pursuant to the Stipulation of

Settlement. The Stipulation of Settlement further provides for a summary dispute resolution

process by Judge Sweeney or Judge Bookbinder of the NJ Superior Court (the "Summary

Dispute Resolution Process").[5]

A number of other agreements were entered by the parties to the transactions in April of

2006 (the "Transaction Agreements")[6] and an agreement was reached with US Homes d/b/a

---

[4] The Stipulation of Settlement was entered into pursuant to litigation in the Superior Court of New Jersey, Burlington County vicinage, captioned *Medford Village East Associates, et. al. v. Township of Medford, et al.* Docket No. BUR-L-11507-96 (the "MVE Litigation") on or about May 20, 2005. The initial focus of the MVE Litigation was on affordable housing, sewer capacity and infrastructure, water supply and infrastructure, wetlands, and zoning and permitting issues related to same.

[5] Paragraph 21 of the Stipulation of Settlement provides as follows:

     Any and all disputes relating to this Stipulation of Settlement or any of the underlying agreements either attached hereto as exhibits or entered into separately pursuant to the Stipulation of Settlement shall be resolved initially as set forth in such agreement. Thereafter, any and all disputes relating in any way to this Stipulation of Settlement or documents or agreements entered into pursuant hereto or attached as exhibits to this Stipulation of Settlement shall be resolved in a summary fashion by application to the Honorable John A. Sweeney, J.S.C., or in the event of unavailability, to the Honorable Ronald E. Bookbinder, J.S.C., whose decision in any such matter shall be based on the express terms of the documents and shall be final and unappealable. See Exhibit D. 17.

[6] These agreements included:

     (1) Agreement of Sale in Lieu of Condemnation between the Township and MVE (the "Condemnation Agreement") which set forth the terms and conditions by which the Township was to acquire the Property from MVE. The Debtors were limited third party beneficiaries of the Condemnation Agreement, subject to Debtors' satisfaction of certain obligations set forth in paragraph 8 of the Condemnation Agreement. See Exhibit D. 16.
     (2) Purchase Agreement between the Township, MCN and MCS (the "Purchase Agreement") – an agreement of sale by virtue of which MCN and MCS were to purchase the Property from the Township.

Lennar (the "Lennar Agreement") regarding the development of the residential portion of the

Project in May 2006.  Lennar paid the $6 million deposit due under the Transaction Agreements

to Samost.  Negotiations by the parties continued in an effort to go forward with the

development, but the parties were never able to reach resolution and complete the project.  The

parties ultimately were not able to proceed with the First Closing under the various Transaction

Agreements which was scheduled to take place by August 28, 2006.  The parties agreed to extend

the date of the First Closing under the Transaction Agreements.

Disputes subsequently arose which were brought before the state court.  At or around the

time the aforementioned disputes began to arise, the residential housing market had begun to

deteriorate.  On September 28, 2007, Judge John A. Sweeney conducted a hearing at the

conclusion of which he ruled that the Transaction Agreements and the Lennar Agreement were

binding on all entities to the transaction and ordered that the Transaction Agreements would be

enforced. On October 5, 2007, Judge Sweeney entered an order that Freeco (defined as the

Debtors, their affiliates and principals) must consummate the Agreement of Sale in Lieu of

Condemnation and the first closing under that agreement by October 31, 2007.  Shortly after the

hearing, on October 17, 2007, ten of the debtor entities filed chapter 11 petitions with this Court

followed by two other filings on October 25, 2007.

---

See Exhibit D. 24.
(3) Redevelopment Agreement between Township and MCN and MCS – (the "Redevelopment Agreement") set forth the terms and conditions of the redevelopment of the Property.  See Exhibit D-18.
(4) MVE/Laurel/Redeveloper Agreement – (the "Redeveloper Agreement") which set forth the rights and obligations of MVE, Laurel, MCN, and MCS on several issues.  See Exhibit D-20.

All of the aforementioned "Transaction Agreements" contain the aforementioned dispute resolution procedures before the Honorable John A. Sweeney.

B.      Proceedings in Bankruptcy

While the Debtors originally expressed a desire to reorganize and complete the pending

construction project, it soon became apparent that a plan of liquidation was the only available

avenue. Shortly after the MVE Litigation was removed to the Bankruptcy Court, the MVE

Litigants filed motions for relief from the automatic stay, mandatory abstention and remand of

the MVE Litigation in the Debtors' bankruptcy case.  On December 19, 2007, this Court entered

an Order abstaining from and remanding the MVE Litigation back to State Court and continuing

the effect of the automatic stay pending the conclusion of the final hearing pursuant to 11 U.S.C.

§362(d).

At the urging of this Court, the parties attempted to mediate the numerous issues involved

in the bankruptcy proceedings and underlying disputes between the parties.  When it became

apparent that the parties' efforts to reach an agreement on the commencement and/or

continuation of the Project were in vain, the MVE Litigants again filed motions for relief from

stay in order to pursue the MVE Litigation and/or compel a rejection of the Transaction

Agreements.  Lennar also filed a motion to confirm the absence of a stay, or in the alternative, a

motion to lift the automatic stay.

As noted above, the Third Modified Disclosure Statement was approved by order dated

October 28, 2008 and amended order dated October 31, 2008 and a confirmation hearing on the

Third Modified Plan was originally scheduled for December 19, 2008.  Objections to the Plan

were filed by Lennar, Cubellis, the MVE Litigants, Pennoni and the Township.  The objections

of Pennoni and the Township were resolved prior to the hearing on confirmation and the

11

remaining objections continued through a contested confirmation hearing which took place over many hearing dates spanning months.

C.   Summary of Third Amended Plan of Reorganization (the "Plan")

The Debtors' Plan calls for a release of claims and the granting of third party releases and injunctions (the "Third Party Releases" and the "Injunctions") in exchange for the Debtors' contribution of their interests in the Project, assets, causes of action[7], "project causes of action," a settlement payment provided by members of the Debtor (the "Settlement Payment"), a payment by FCD (the "FC Payment"), the subordination of the claims of Freedman Cohen Development, LLC and a member contribution made for the benefit of the creditors and the Debtors (the "Member Contribution").

---

[7]  The Debtors allege that they possess contractual reimbursement rights (the "Reimbursement Rights") for their investment in the Project.  The Debtors, in the Plan, point to the Cost Sharing Agreement and the Condemnation Agreement entered into between the parties which require reimbursement to the Redeveloper (MCN, MDS and the Purple Tree Investments LLC) as a condition precedent to (1) MVE's retention and use of the Project plans, document, approvals, information, leases, agreements or rights of any kind in and to the developments and (2) MVE's right to proceed with the development of the Property.

Specifically, Paragraph 14 of the Condemnation Agreement provides:

A default under paragraph 14A shall also entitle MVE to retain and/or seek a Court Order that it owns any and all right, title and interest in and to any plans, documents, approvals, information, leases, agreements or rights of any kind in and to the developments, which shall vest indefeasibly in MVEA, subject to an obligation to Reimburse Redeveloper [MCN, MCS, and Purple Tree Investments, LLC] for agreed upon actual out of pocket costs and expenses to third parties, excluding attorneys fees.  MVE shall thereafter have the right to proceed with the development of the Property as set forth on the approved plans for the developments, and may also pursue any other legal or equitable action to which it may be entitled.

Paragraph 11.1 of the Cost Sharing Agreement provides:

...[a] default on any payment by Freeco to the Township prior to or at the First Closing shall also entitle MVE to retain and/or seek a Court Order that it owns any and all right, title and interest in and to any plans, documents, approvals, information, leases, agreements or rights of any kind in and to the developments, which shall vest indefeasibly in MVE, subject to an obligation to reimburse Freeco for agreed upon actual out of pocket costs and expenses, excluding attorneys fees, to third parties.  MVE shall thereafter have the absolute right to proceed with the development of the properties as set forth on the approved plans for the developments, and may also pursue any other legal or equitable action to which it may be entitled, except that in no event shall any default after the Second Closing hereunder allow MVE or Laurel to make any claim against any of the commercial portions of Medford Crossings or to file any lien thereon.

I.     Funding the Plan

The Debtors allege that the Plan will be funded by the contributions of Debtors' Assets to the Project, the Member Contributions, the FC Payment and the Settlement Payment, as well as the relinquishment of certain Reimbursement Rights and the waiver of the Project Causes of Action.

a.     Assets to the Project

The Debtors allege that they have unliquidated interest in the Project Plans and the Permits and Approvals associated with the Project.  The Debtors aver that they are unable to determine with certainty the value of their respective interests, however, they also note that because they expended more than $4,000,000 on the Project Plans and Permits and Approvals, such assets are indeed valuable to the Debtors' estate, even if in an as yet unliquidated amount. The Debtors also assert that they have certain Reimbursement Rights under certain Transaction Agreements which would possibly allow them to claim in excess of $4,000,000 in reimbursements.

b.     Member Contribution

The members of the Debtors (the "Members") agreed to fund, upon confirmation of the Plan (a) payment of unpaid Allowed Professional Fees up through Confirmation Date; (b) Professional Fees for work related to the post-confirmation implementation of the Plan; (c) prosecution of certain causes of action, if any, as objections to Proofs of Claim; and (iv) defense of Debtors' interests in Assets.  The Debtors estimated this Member Contribution to result in payment of approximately $500,000 by the Members.

c.    <u>Member Settlement (First and Second)</u>

The Debtors, Members, and the Unofficial Committee of Unsecured Creditors (the
"Committee") discussed various causes of action which the Debtors might allege, and as a
proposed Settlement, the Members agreed to pay the Unsecured Creditors up to 25% of their
allowed claims, not to exceed a total payout of $660,000.  The Members also initially agreed to
pay 33% of net recoveries on Project Causes of Action and remaining assets.  Because the
Project Causes of Action would likely result in protracted and costly litigation, the Members
contend that it was thereafter agreed that they would make a Second Member Settlement wherein
the Members would contribute an additional $50,000 directly to Debtors' estates in exchange for
Debtors' release and waiver of the Project Causes of Action.   It should be noted that in the
Debtors' Disclosure Statement they allege that all of the claims asserted by the Township and
MVE Litigants are derivative claims, that they lack merit, that they belong solely to the Debtor to
pursue, and that they are of marginal value.

d.    <u>The FC Payment</u>

FCD and FC Development Group, LLC ("FCDG") agreed to contribute $40,000 to the
Member Settlement as additional consideration for their inclusion in the Third Party Releases
and Injunctions.  FCD additionally agreed to subordinate its claims against the Debtors in
exchange for inclusion in the Third Party Releases and Injunction.  FCD and FCDG were named
as defendants in State Court litigation by Cubellis, alleging alter ego, piercing corporate veil, and
successor liability claims.  The Debtors allege that the causes of action asserted against these
parties have a nuisance value only and are not significant legal claims.  Pulte, a developer
previously involved in the Project, also alleged liability against certain of the Debtors in State

Court, and FCD was named as an additional obligor on the Judgment entered in Pulte's favor for

$400,000. The Debtors allege that the Judgment will likely be vacated as to FCD and once

vacated, the Judgment will be enjoined if the Plan is confirmed.

      ii.    Third Party Releases and Injunction

The Plan provides that on the Confirmation Date the Debtors will request an injunction

preventing any creditor from asserting any cause of action owned and/or settled by the Debtors

and the Committee including, *inter alia*, all claims against the Third Party Releasees[8] (the "Third

Party Releasees" or the "Releases") which could be asserted by the Debtors, including but not

limited to alter ego, successor liability, and piercing corporate veil claims; and also all claims or

liabilities which could be asserted by creditors, relating to, or arising from, the business,

operations or management of the Debtors and/or the Project.

The Plan further provides that upon the Effective Date, in consideration for the

Settlement Payment, the Member Contribution, the subordination of the allowed claims of

Freedman Cohen Development LLC and the FC Payment, the Debtors, their representatives and

their estates will be deemed to have released the Third Party Releasees from any and all claims

which the Debtors, their representatives or their estates have arising out of or by any reason. The

Plan further provides that, "...other than obligations arising from the Indemnity Agreement[9], the

---

[8]  Third Party Releasees is defined by the Plan as the "Members, and each of their respective principals, partners, shareholders, members, related entities, affiliates, agents, subsidiaries, successors, officers, directors, managers, employees and advisors, including without limitation, Mitchell Cohen; Carl Freedman; FC Development Group, LLC; Freedman Cohen Development LLC; Medford Crossings South Development Assoc., LLC; Medford Crossings South II, LLC; Medford Crossings North Development Assoc., LLC; Medford Crossings North II, LLC; Medford Crossings Restaurants, LLC; Christopher Conlon; Todd Cooper; Peter Ripka; and Ripco Ventures, Inc., and any Persons sharing the profits of Debtor, FC Medford Residential LLC, or any of the above entities.

[9]  It is unclear from Debtors' Plan and Disclosure Statement to which "Indemnity Agreement" they are referring. Neither the Debtors' Plan nor the Disclosure Statement identify and/or the specific "Indemnity Agreement" to which they refer.

Third Party Releasees are released from any and all claims that any entity would have been

entitled to assert in its own right or on behalf of the holder of any claim or equity interest for

claims or liabilities relating to the business, operations, conduct or management of the Debtors

and the Project prior to the Effective Date, any transactions with the Debtors, or any transactions

with the Third Party Releasees or the Debtors."[10]

### iii.    Classification and Treatment of Claims and Interests

The claims against and interests in the Debtors were divided into six classes of claims and

one class of member interests under the Plan.  Class 1 consists of the Claim of Pennoni; Class 2

consists of the Claim of Lennar; Class 3 consists of the unliquidated unsecured claims of the

Township; Class 4 consists of the Claim of other general unliquidated unsecured claims

(primarily consisting of claims of the MVE Litigants); Class 5 consists of general unsecured

claims; and Class 6 consists of the unsecured claims of FCD; and Class 7 consists of all member

interests in the Debtors.

As noted above, the claims of Pennoni and the Township, Classes 1 and 3 respectively,

were resolved prior to the hearing on confirmation.  The Class 2 Lennar claim is on account of

the $6,000,000 deposit placed by Lennar for the residential portion of the Project (the "Deposit").

As security for the return of the Deposit, MVE executed a first Mortgage dated May 12, 2006 and

---

[10]  The Plan specifically provides that the "Debtors, Carl Freedman, Mitchell Cohen and/or Freedmen Cohen
Development LLC are not waiving their rights to seek reimbursement or any other relief or to assert any claims,
rights, or defenses against any individual or entity arising out of, or in any way connected to the Indemnification
Agreement and all other related documents and agreements."

recorded on May 23, 2006.[11]  Lennar was unable to produce an executed note (the "Note")

evidencing any debt obligations related to the aforementioned Mortgage.  Lennar was granted

relief from the automatic stay to foreclose the Mortgage, but was prohibited from adjudicating

any claims against the Debtors.  The Debtors contend that the Lennar Claim will be paid in full

by foreclosure on the Mortgage, and therefore, no distribution is contemplated under the Plan on

account of the Lennar Claim.  The Debtors assert that they will waive and release all of their

claims and causes of action against Lennar in consideration for the Third Party Releases and

Injunctions and in full satisfaction of all of Lennar's claims against the Debtors and the Third

Party Releasees.

The Class 4 claims consist of other contingent and/or unliquidated unsecured claims

against Debtors, other than those of the Township, arising out of the Transaction Agreements.

The Plan provides that, if permitted to file Proofs of Claim, the claims of the MVE Litigants will

be considered Class 4 claims and will receive releases of the Debtors' alleged claims against

them, and shall be bound by the Third Party Releases and Injunctions under the Plan.

It is proposed that the Class 5 claims will receive a *pro rata* distribution of a portion of

the Settlement Payment remaining after the payments to Pennoni and the Township; as well as

the FC Payment.  The Debtors' proposed Plan contemplates that the confirmation order would

constitute a Rule 9019 Order, approving the Member Settlement (the "Member Settlement")

wherein Class 5 claimants would receive an amount equal to 25% of the outstanding Class 5

allowed unsecured claims, not to exceed $660,000, in exchange for the release of (I) all claims

against the Third Party Releasees which could be asserted by the Debtors, and; (ii) all claims or

---

[11]  The Mortgage was recorded in the Burlington County Court Clerk's office in Mortgage Book 10930 beginning at page 452.

liabilities which could be asserted by creditors, relating to or arising from the business, operations, conduct or management of the Debtors and/or the Project. The Plan also provides that as an additional provision of the Member Settlement, such sums to be divided pro rata to Class 5 claimants, the Third Party Releasees agreed to pay Debtors' estates an additional sum of $50,000 in exchange for the Debtors' agreement to release and waive the Project Causes of Action; and the FCD and FCDG will pay the Debtors' Estate the sum of $40,000 as additional consideration for the inclusion of the FCD and FCDG Third Party Releases and Injunctions.

As for Class 6, FCD purportedly agrees to voluntarily subordinate its Claims to Class 5 in exchange for its inclusion in the Third Party Releases and Injunctions. Furthermore, Class 7, which consists of member interests in the Debtors, will receive no distribution upon liquidation and any member interests will allegedly be dissolved upon the full execution of the Plan.

As for professional fees, the Debtors propose to pay such professional persons within the meaning of §327 of the Bankruptcy Code employed with the Bankruptcy Court's approval and other persons who may be entitled to such allowance of fees and expenses pursuant to §503(b)(2), (3) or (4) of the Bankruptcy Code cash in the amount awarded to such person by order of the Bankruptcy Court on the Confirmation Date (unless ordered otherwise by the Bankruptcy Court). At the time of proposing its Plan, the Debtor was represented by Obermayer Rebmann Maxwell & Hippel, LLP ("Obermayer"), however, said counsel subsequently filed a Motion to Withdraw from the Debtors' bankruptcy case.[12] On August 28, 2009, the Debtors filed

---

[12] On August 8, 2009, Obermayer filed its Motion to Withdraw as Counsel to Debtor. In their certification in support thereof, Obermayer alleges that the approved fees from the first fee application were not paid in full and that the principals, in order to induce Obermayer to continue to provide legal services to Debtors, made representations that the principals would continue to fund the fees. See Doc. No. 651-1, Case No. 07-25115. In the Members' response to Obermayer's Motion to Withdraw, the Members allege that Obermayer paid the first invoice in full (less the Court required holdback), the second Obermayer invoice was paid in full (less 25%), and that the remaining fees

an application for the retention of Courtney A. Schael of Ashford-Schael LLC and this Court

entered an Order approving said application on September 9, 2009.

    iv.  <u>Liquidation Analysis</u>

   The Debtors allege that the Project Plans do not have a value in excess of the claims of

Pennoni in the Project Plans and therefore, on liquidation, the Debtors would not receive funds

exceeding the approximate $1,000,000 claim of Pennnoni if they attempted to independently sell

their interest in the Project Plans. The Debtors, the Township and MVE previously entered into a

consent order permitting the Township and MVE to continue to utilize the Project Plans and

Approvals, thus, the Debtors could not independently sell their interest in the Project Plans. The

Debtors also conclude that their interest in the Transaction Agreements has no value to their

creditors. Therefore, the Debtors allege that, other than their Reimbursement Rights, the

Debtors' interests in the Transaction Agreements have no value to their creditors.

   The Debtors allege, however, that creditors will fare better under the Plan because they

are waiving certain claims, including, *inter alia*, Reimbursement Rights under the Transaction

Agreements, other causes of action related to the project (the "Project Causes of Action").

Furthermore, the Debtors allege that the creditors will fare better under the Plan because, in

exchange for the Third Party Releases and Injunction, the Members have agreed to a direct

payment to unsecured creditors of approximately $1,000,000, which would otherwise be

unavailable in a liquidation.

   The Project Causes of Action which will allegedly be settled or waived as part of the Plan

include (I) claims against Samost, MVE and other Samost related entities, including, *inter alia*,

---

allegedly owed to Obermayer were disputed by the Debtors and Members and that they have been unable to resolve
said dispute. See Doc. No. 6544, Case No. 07-25115.

RICO claims, fraudulent inducement, conspiracy, and fraud; (ii) claims against Lennar,

including, *inter alia*, breach of contract; and (iii) claims against the Township of Medford,

including, *inter alia*, breach of contract, conspiracy and fraud. The Debtors allege that all

creditors of the Debtors would fare better under the Plan, as opposed to liquidation, as a result of

the settlement, release and/or waiver of the above Project Causes of Action, along with the

Member Settlement and contribution of Debtors' Remaining Assets and interest in the Project

Permits and Approvals. The Debtors estimate that a liquidation in a Chapter 7 case would

generate no or *de minimis* distribution to creditors and further, that there would be insufficient

funds for a chapter 7 trustee to pursue litigation for the benefit of all creditors.


III.    CONCLUSIONS OF LAW

For reasons more fully explained below, the Debtors' Chapter 11 Plan cannot be

confirmed. The Third Party Releases and Injunction provided for in the Plan are impermissible

in the context in which the Debtors have proposed, and have ultimately defeated the chance that

Debtors' Plan could be confirmed and further costly State Court litigation could be avoided. As

more fully set forth hereunder, even though this Court may have both the subject matter

jurisdiction under 28 U.S.C. §1334(a) and the general legal authority under 11 U.S.C. §105(a) to

confirm a plan that includes a third party release and/or injunction, it is nonetheless an

extraordinary act that the Bankruptcy Code does not lightly authorize. To deprive one non-

debtor of its legal remedies against another non-debtor is indeed extraordinary, and will be

supported by equity only after the court has considered the impact that confirmation of the plan

will have on all of the parties affected. As one court in this Circuit recently put it,

> "[c]ourts may approve third party releases only when the
> reorganization plan is widely supported by the creditor
> constituency that includes the parties being restrained, accords
> significant benefits to that constituency and the court is satisfied
> that the creditors being restrained also are being treated fairly…[i]t
> is a very narrow legal realm in which a party's legal rights may be
> restricted because the needs of the many outweigh the rights of the
> few."

In re Saxby's Coffee Worldwide, LLC, 436 B.R. 331 (Bankr. E.D.Pa. 2010).  This analysis

mandates the denial of confirmation of the Debtor's Plan.  The parties that would be restrained

from proceeding against the Releasees receive no meaningful distribution under the Plan and are

precluded from asserting their claims against the Releasees.  If the Plan were confirmed, the

rights of the restrained parties would be nullified without any commensurate benefit to them

under the Plan.

The Debtors' reorganization goals are worthy and the Debtors have made great efforts in

successfully crafting a Plan that complies with many of the provisions of section 1129 of the

Bankruptcy Code which are required for confirmation.  However, confirming the Plan as

presented by the Debtors would result in an unprecedented expansion to any exception to 11

U.S.C. §524(e) that may exist in this Circuit, and such expansion is neither equitable nor

warranted in this case.  In light of my denial of confirmation on these grounds, it is unnecessary

to reach the other substantive objections raised by the Movants herein.

A.    This Court Has Jurisdiction to Consider Plan

Federal bankruptcy jurisdiction is defined by 28 U.S.C. §1334.  Section 1334(b) confers

upon the district courts "original and exclusive jurisdiction of all cases under title 11," and

"original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in

or related to cases under title 11." 28 U.S.C. §1334(b).  Section 157(a) of the Bankruptcy Code

permits district courts to refer most matters to a bankruptcy court. See 28 U.S.C. §§157(a), 151.

Section 157(b) provides a non-exhaustive list of examples of core proceedings such as "matters

concerning the administration of the estate," "orders to turn over property of the estate," or "other

proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-

creditor or the equity security holder relationship, except personal injury tort or wrongful death

claim." Id.[13]  This broad jurisdictional grant allows bankruptcy courts to "deal efficiently and

expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*,

514 U.S. 300, 308, 115 S.Ct. 1493 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d

Cir. 1984).  Confirmation of a Plan of Reorganization is a "core proceeding," 28 U.S.C.

§ 157(b)(2)(L), and therefore the Bankruptcy Court has jurisdiction to consider the Debtors'

proposed Plan.[14]

---

[13]  The full list of examples of core proceedings follows:
(A) matters concerning the administration of the estate; (B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a pln under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of any contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11; (C) counterclaims by the estate against persons filing claims against the estate; (D) orders in respect to obtaining credit; (E) orders to turn over property of the estate; (F) proceedings to determine, avoid, or recover preferences; (G) motions to terminate, annul, or modify the automatic stay; (H) proceedings to determine, avoid, or recover fraudulent conveyances; (I) determinations as to the dischargeability of particular debts; (J) objections to discharges; (K) determinations of the validity, extent, or priority of liens; (L) confirmations of plans; (M) orders approving the use or lease of property, including the use of cash collateral; (N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate; and (o) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.
28 U.S.C. §157(b)(2).

[14]  The Debtors' Proposed Plan includes releases and injunctions in favor of both the Debtors and certain creditors. In order to approve a third party release or injunction, the Bankruptcy Court must have "related to" jurisdiction over the claims affected. Here, the Plan proponents merely allege that the court has jurisdiction to consider the proposed Plan, including the Third Party Releases and Injunction.  Whether or not said Third Party Releases and Injunctions are appropriate and/or confirmable as part of a Plan of Reorganization is not a threshold jurisdictional issue. The Bankruptcy Court may ultimately determine that it cannot approve the above referenced provisions of the Plan;, however, this Court has jurisdiction to consider said provision as part of the Plan confirmation process. *Samost, MVE, et al v. Medford Crossings North, LLC, et al*, 2009 U.S. Dist. LEXIS 50464 (D.N.J. 2009).

22

B.        Third Party Releases and Injunction

As noted above, the Third Party Releases and Injunctions are at the heart of this contested

matter.  The Debtors allege that prior to the Member Settlement entered into by the Creditors

Committee, the Debtors' Members, the Members' principals, and other third parties (the

"Settling Parties"), the Debtors had claims against such Settling Parties regarding the Project,

including, *inter alia*, piercing the Debtors' corporate veil and/or alter ego claims for debts

purportedly incurred by the Debtors.  The Debtors argue that since the above Settling Parties will

have entered into the Membership Settlement, these derivative[15] claims of Debtors' will be

released through said settlement.  Further, the Debtors contend that because substantially all of

the claims asserted against the Debtors' Members, the Members' principals, and other third

parties by MVE, Laurel, Samost, Lennar and/or Cubellis are derivative claims that belonged to

the Debtors prior to the Member Settlement, MVE, Laurel, Samost, Cubellis, and/or Lennar

cannot prove that they have direct claims against the Debtors' Members, the Members'

principals, and/or other third parties which they would be able to pursue individually.

The Movants argue that this Court lacks subject matter jurisdiction to issue the proposed

Third Party Releases and Injunction, and as a result thereof, they argue that this Court lacks

---

[15] To the extent that the Plan purports to deal with derivative claims asserted by the Movants, this Court clearly has
jurisdiction as they constitute property of the Debtors' Estate.  The Bankruptcy Code definition of "estate" is given
broad application and includes all kinds of property, including causes of action.  See *United States v. Whiting Pools*,
462 U.S. 198, 205 n. 9 (1983).  A cause of action is considered property of the bankruptcy estate if the claim existed
as of the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law.
11 U.S.C. §541.  *Butner v. United States*, 440 U.S. 48, 54, 99 S. Ct. 914 (1979).  For a claim to be considered a
"'legal or equitable interest of the debtor in property,'" it "must be a 'general one, with no particularized injury
arising from it.'" *Foodtown, Inc.*, 296 F.3d at 170. (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884
F.2d 688, 701 (2d Cir.1989)).  When a "claim is specific to the creditor, it is a 'personal' one and is a legal or
equitable interest only of the creditor," and such a claim "is personal to the creditor if other creditors generally have
no interest in that claim." *Id.* (citing *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1348-49
(7th Cir.1987)).

jurisdiction to even consider the Plan.  Furthermore, the Movants argue that, assuming *arguendo*

jurisdiction exists, the Third Party Releases and Injunctions are not confirmable as part of the

Debtors' Plan because the Releasees have not paid adequate, indeed any, consideration in

exchange for said releases.  The Debtors counter by arguing, *inter alia*, that without any viable

direct claims against any of the Releasees, the Movants are not specifically entitled to any

separate consideration in exchange for said Third Party Releases.  Moreover, the Debtors allege

that the following valuable consideration is in fact being given in exchange for the Third Party

Releases and Injunction, if it is the case that Movants hold any direct claims against the

releasees: (1) approvals and permits obtained by the Debtors related to the Project; (2) Debtors'

release of their claims for reimbursement under the Transaction Agreements; and (3) Release of

Project Causes of Action against MVE, Laurel, and Samost.

      I.       This Court Has Related To Jurisdiction to Consider
                  and/or Issue Third Party Releases and Injunction

      Although federal bankruptcy jurisdiction is deliberately expansive and "conspicuous for

its breadth," *Morales v. Trans World Airlines*, 504 U.S. 374, 384, 112 S. Ct. 2031 (1992), it is

not without limitation. See *Bd. Of Governors of Fed. Reserve Sys. V. MCorp Fin., Inc.*, 502 U.S.

32, 40.  Thus, the boundaries of bankruptcy jurisdiction cannot be extended merely to facilitate a

particular plan of reorganization, even where such a reorganization might be perceived to be in

the public interest.  *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004) *citing*

*Baltimore County v. Hechinger Liquidation Trust (In re Hechinger Inv. Co. of Del., Inc.)*, 335

F.2d 243, 256 (3d Cir. 2003).

      Bankruptcy court jurisdiction potentially extends to four types of title 11 matters: (1)

cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a case under

title 11, and (4) proceedings related to a case under title 11." *Binder v. Price Waterhouse & Co.,*

*LLP (In re Resorts Int'l Inc.)*, 372 F.3d 154, 162 (3d Cir. 2004).  The first three of the

aforementioned proceedings are referred to as "core" proceedings' whereas proceedings "related

to" a case under title 11 is referred to as a "non-core" proceeding.  Whether claims are considered

core or non-core proceedings dictates not only the bankruptcy court's role and powers but also

the availability of mandatory abstentions, see 28 U.S.C. §157(b)(4), and the enforcement of

forum selection clauses, see *In re Diaz Contracting, Inc.*, 817 F.2d 1047, 1051-53 (3d Cir. 1987).

Proceedings related to a title 11 case include causes of action owned by the debtor that become

property of the bankruptcy estate under 11 U.S.C. §541(a), as well as suits between third parties

that conceivably may have an effect on the bankruptcy estate.  *Celotex*, 514 U.S. at 308.  The

latter type of proceeding is at issue in the case at hand.

   The seminal test for determining "related to" jurisdiction over third-party claims was set

forth in *Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984).  In evaluating the scope of "related to"

jurisdiction, it is important to acknowledge that Congress intended to grant bankruptcy courts

broad authority to deal expeditiously with all matters pertaining to the bankruptcy.  *Id.* at 308.

Such power, however, is not unlimited.  In outlining the appropriate balance, the *Pacor* court

stated:

> The usual articulation of the test for determining whether a civil
> proceeding is related to bankruptcy is whether the outcome of that
> proceeding could conceivably have any effect on the estate being
> administered in bankruptcy … An action is related to bankruptcy if
> the outcome could alter the debtor's rights, liabilities, options, or
> freedom of action (either positively or negatively) and which in any
> way impacts upon the handling and administration of the
> bankruptcy estate.

*Pacor*, 743 F.2d at 994 (citations omitted). The potentially expansive language in *Pacor*,

however, is subject to the limiting principles also announced in that case: "The test articulated in

*Pacor* for whether a lawsuit could conceivably have an effect on the bankruptcy proceeding

inquires whether the allegedly related lawsuit would affect the bankruptcy without the

intervention of yet another lawsuit." *In re Federal-Mogul Global, Inc.,* at 382.

Eighteen years after *Pacor*, the Third Circuit reaffirmed and clarified the *Pacor* test in *In

re Federal-Mogul Global, Inc.*, 300 F.3d 368 (3d Cir. 2002). The *Federal-Mogul* court stated

that "the test articulated in *Pacor*… inquires whether the allegedly related lawsuit would affect

the bankruptcy proceeding without the intervention of yet another lawsuit." *Id.* at 382.    The

*Federal Mogul* court ultimately held that there was no related to subject matter jurisdiction to

enjoin an action by a third party against a non-debtor because the indemnification claim held by

the non-debtor against the debtors had "not yet accrued and would require another lawsuit before

[having] an impact on [the debtor's] bankruptcy proceeding." *Id.* at 382.

More recently, in *In re Combustion Engineering, Inc.*, the Third Circuit examined

additional grounds for "related to" jurisdiction. 391 F.3d 190, 230 (3d Cir. 2004). In

*Combustion Engineering*, the debtor argued that a unity of interests between the debtor and its

non-debtor affiliates based on the debtor's potential indemnity obligations to the affiliates, as

well as the existence of both a shared production site and shared insurance, provided sufficient

basis for "related to" jurisdiction to permit the court to enjoin an action by a third party against

the non-debtor affiliates. *In re Combustion Engineering, Inc.*, 391 F.3d 190, 230 (3d Cir. 2004).

The court found, however, that, based on prior rulings of the Third Circuit and in the absence of

any derivative liability "[any] indemnification claims against Combustion Engineering … would

26

require the intervention of another lawsuit to affect the bankruptcy estate, and thus cannot

provide a basis for "related to" jurisdiction." *Id.* at 232.

Most recently, in *W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)*[16], the Third

Circuit reaffirmed that, "[p]roceedings over which a bankruptcy court can legitimately exercise

related-to jurisdiction include suits between third parties that conceivably may have an effect on

the bankruptcy estate." *In re W.R. Grace & Co.*, 591 F.3d 164, 171 (3d Cir. 2009) (citing

*Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 5, 115 S.Ct. 1493, 131 L.Ed. 2d 403 (1995)).

The court explained that related to jurisdiction only exists where there debtor is bound by any

judgment against the third party in question, without the intervention of another lawsuit to

enforce an indemnification or contribution claim. *Id.* at 173.    Thus, the *W.R. Grace* decision is

further affirmation of the Third Circuit's "any conceivable effect" test as established by *Pacor*

---

[16] Prior to W.R. Grace's bankruptcy filing, the claimants in the asbestos litigation also filed suit against the debtor in Montana courts against the State of Montana alleging that Montana was negligent in failing to warn the claimants of the risks of asbestos liability in the W.R. Grace mine. When it was determined by the Montana Supreme Court that the State of Montana had a duty to gather "public health-related information and provide it to [its citizens]" the State of Montana sought relief from the automatic stay to implead Grace as a third party defendant in the state court litigation.  Grace opposed the motion and filed its own motion asking the bankruptcy court to expand the preliminary injunction pursuant to 11 U.S.C. §105(a) enjoining litigation against Grace and certain of its non-debtor affiliates that was already in place.

The bankruptcy court denied Grace's motion to extend the injunction, finding that it did not have subject matter jurisdiction over those actions.  See *W.R. Grace*, 366 B.R. 295, 301 (Bankr.D.Del. 2007).  The court reasoned that the state court actions against the State of Montana would have no direct effect on Grace's bankruptcy estate, and because the State of Montana would have to pursue an additional claim against Grace for indemnification prevented the Bankruptcy Court from having the necessary "related to" jurisdiction to stay the action against the state. *Id.* Reaffirming the *Pacor* precedent and its progeny, the Third Circuit upheld the decisions of the lower courts holding that the bankruptcy court did not have the authority to enjoin the state court litigation.  The Third Circuit noted that "related to" jurisdiction over third party actions is inappropriate where the result of the third party action, absent an additional lawsuit, would not have a direct effect on the bankruptcy estate in question.  The Third Circuit likened *W.R. Grace* to *Pacor*, *Federal Mogul*, and *Combustion Engineering*, stating that "our recently reaffirmed precedent dictates that a bankruptcy court lacks subject matter jurisdiction over a third party action if the only way in which that third-party action could have an impact on the debtor's estate is through the intervention of yet another lawsuit." *In re W.R. Grace & Co.*, 591 F.3d at 173.  Just as in *Combustion Engineering*, the Third Circuit rejected the "unity of interests" argument because the State of Montana was not in the business of producing asbestos, and the state's potential liability was based upon an independent legal duty owed to the people of the state. *Id.*

and clarified by *Federal Mogul* and *Combustion Engineering*.  In the absence of any direct effect

on the debtor's estate, a bankruptcy court in this Circuit is without authority to enjoin actions

against non-debtors.[17]

The Debtors in the instant case allege that, to the extent this Court holds that any of the

claims sought to be released are direct claims, and not derivative claims belonging to the Debtor,

the factual record supports related to jurisdiction.  The Debtors argue that the claims to be

released under the Plan are limited to those relating to the Debtors, their business and the Project,

that all claims arise from the same facts and circumstances and with the same creditors, that

certain indemnification provisions would affect the Debtors' estate and that all of their alleged

claims against the Debtors and the Settling Parties arise out of the Transaction Agreements or the

Stipulation.  Finally, the Debtors allege that the claims and causes of action are assets of the

bankruptcy estate and as a result, any claims against the Settling Parties relating to the Debtors or

the Project will indisputably affect the Debtor's bankruptcy estate, thus falling within this

Court's related to jurisdiction.

---

[17]  See also *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187 (3d Cir. 1999).  In *CoreStates*, the court addressed the question of "related to" jurisdiction over an inter-creditor dispute.  Both CoreStates and Huls America, Inc. had extended substantial credit to the debtor, United Chemical Technologies, Inc. ("UCT").  The parties subsequently entered into a subordination agreement to clarify their respective rights to payment from the debtor, under which UCT's debts to Huls were subordinated to debts owed to CoreStates.  Huls also agreed that it would not retain any payment by debtor, including any payments under a plan, until UCT had paid CoreStates in full.  The debtor ended up paying Huls in full satisfaction of its debt ($600,000) prior to plan confirmation and CoreStates demanded that Huls pay this sum over to it under the terms of the parties' agreement.  CoreStates further objected to plan confirmation on the ground that the proposed payment to Huls unfairly discriminated among similarly situated creditors.  CoreStates filed a federal suit alleging Huls was obligated to pay it the $600,000 as a result of the subordination agreement.  The district court concluded that CoreState's claim was precluded because the bankruptcy proceeding was the proper forum to raise its objection to said payment.  In CoreStates, the district court found that the claim based on the subordination agreement fell within the court's "related to" jurisdiction; and that Huls, as a creditor of the estate, gave up a $3 million dollar claim in exchange for an up-front payment of $600,000.  "Related to" jurisdiction arose because resolution of the subordination dispute "conceivably would have impacted upon the debtor's options in crafting a plan that met with [one of the creditor's] approval and thereby affected the handling of the bankruptcy estate."  Id.  Without the payment to Huls, the court reasoned, Huls "might not have consented to the Plan" and "UCT might have had a much more difficult time having the Plan confirmed."  Id. at 204.

The Movants argue that the Debtors are shell entities that can do nothing without the

money and actions of the Principals, either directly or indirectly through the Debtors' affiliates.

Because the Debtors have no assets, the Movants argue, their already "depleted" estate would be

unaffected by any claims and lawsuits, particularly so since the Debtors are proposing a

liquidating plan of reorganization.  The Movants also argue that the indemnification provisions

found in the Operating Agreements of the Debtors are of no consequence because the conflicting

testimony Mr. Freedman and conflicting documentary evidence showed that the Operating

Agreements were not executed until well after the conduct giving rise to the potential claims is

alleged to have occurred.

In *Dow Corning I*, 86 F.3d 482, 493 (6th Cir. 1996), the court found "related to"

jurisdiction based on the "identity" of interest created by shared insurance policies and potential

claims for contribution and indemnification against Dow Corning by non-debtors.  In that case,

the personal injury liability of both the debtor and non-debtors was based on a single product,

silicone breast implants.  Dow Corning manufactured nearly half of the entire market and

supplied raw materials to all other manufacturers of breast implants.  Being that Dow Corning

was involved in either the supply or manufacturing side of all breast implants, the court found

that there was near certainty Dow Corning would be directly or derivatively liable for any injury

resulting from a breast implant.  The court, thus, had "related to' jurisdiction over the personal

injury claims against non-debtors based the potential for indemnification claims against the

debtor.  The near certainty that Dow Corning would be directly or derivatively liable for any

injury resulting from the debtor's product caused the court to find related to jurisdiction, and

other courts have similarly found "related to" jurisdiction where the potential liability arises from

29

express indemnification obligations or derivative liability.  See e.g., *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1007-1008 (4th Cir. 1986); see also, *McArthur Co. v. Johns-Manville*, 837 F.2d 89, 92-93 (2d Cir. 1988).  Like the circumstances of *Dow Corning*, the potential liability arising from express indemnification provisions herein described as well as the identity of interests of Debtors and other third parties, confer related to jurisdiction in this case.

At the Confirmation hearing the Debtors offered the following evidence to establish related-to jurisdiction over the claims against the Debtors' insiders.  First, Mr. Freedman testified that the operating agreements of the Debtors contained indemnification provisions[18], which were substantially similar in each case.  As noted by the Movants, however, the testimony of Mr. Freedman regarding the approximate date of execution of the Debtors' operating agreements was contradicted by the recitals therein regarding the U.S. Home/Lennar agreement.  See e.g., Exhibit D-4.  There is also an express indemnification agreement contained in the Agreement of Sale in lieu of Condemnation which provides that a default under the agreement shall entitle "MVE to

---

[18]  The indemnification provisions provide for the following:

Subject to the limitations and conditions as provided in this Article 8, to the fullest extent permitted by law, each Person who is or was a Manager, Officer, or employee of the Company, or while a Manager, Officer or employee of the Company is or was serving at the requires of the Company as a Manager, director, officer, partner, member, employee or agent or similar functionary of a Subsidiary (each of the foregoing being referred to herein as a "covered Person," and each Affiliate to which each such Covered Person is related being referred to herein as a "Related Person") shall be indemnified, defended and held harmless by the Company for, from and against any and all losses, claims, damages, liabilities, judgments, fines, settlements, demands, actions, or suits and reasonable expenses (including attorneys' fees and costs) actually incurred by such Covered Person, relating to or arising out of the business of the Company, or the exercise by the Covered Person of any authority conferred on it hereunder or the performance by the Covered Person of any of its duties and obligations hereunder or at the request of the Company, or by reason of the fact that he is or was a Manager or Officer of the Company or while a Manager or Officer of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, member employee or agent or similar functionary of a Subsidiary.  Notwithstanding anything contained in this Agreement to the contrary, no Covered Person shall be entitled to the indemnification hereunder with respect to any claim, issue or matter: (i) in respect of which he (or the Company as the result of his act or omission) has been adjudged liable for criminal conduct, fraud, gross negligence or willful misconduct; (ii) based upon or relating to the performance of services outside the scope of the duties as set forth in this Agreement or as otherwise delegated to such Covered Person in accordance with this Agreement.

retain and/or seek a Court Order that it owns any and all right, title, and interest in and to any

plans, documents, approvals, information, leases, agreements or rights of any kind in and to the

developments ... subject to an obligation to reimburse [MCN/MCS/PT as Redeveloper] for

agreed upon out of pocket costs and expenses, excluding attorneys fees." See Exhibit D-16.

In addition to the indemnification provisions supporting related to jurisdiction, the

Members have also made clear that, but for the Third Party Release and Injunction, the Members

would not fund the Debtors' Plan of Reorganization.[19] It seems clear from the above

indemnification provisions and contributions by the Third Party Releasees, that the claims which

the Debtors propose to release as part of the Plan revolve solely around the Project and various

agreements entered into in furtherance thereof. All parties that the Plan proposes to release and

those that will be affected by said releases and injunctions, have clearly received notice of the

Debtors' Plan and had a chance to be heard with respect thereto; indeed, most if not all of the

parties that will be affected by the Third Party Releases and Injunction have been active

---

[19] When asked about the third party releases at the Confirmation Hearing, Mr. Freedman testified to the following:
Q. And would it be fair to say that all the claims, it's a universal third-party release between all of the debtors and MVE and Samost?
A. That's the only reason the debtors and the members are willing to do this is just to be done with him.
Q. And why is it that the members are insisting on a third-party release?
A. Because he's a litigious type person who will just keep filing lawsuit after lawsuit even if they have no merit.
...
Q. Are the members willing to fund the debtors' plan of reorganization in the absence of these third-party releases?
A. No.
Q. And why is that?
A. Just because its just going to continue with him – with Samost. If its not – if there's no finality to it, he'll just keep coming. So as opposed to putting this money into – this money's going to go into cleaning this up, one way or another. Either its going into the plan to clean it up that way and finish it that way or its going to go into a litigation war chest, because that's where we're heading.
Q. So, in other words, you either fund this for the debtors or if this can't go through then you'll retain those funds to try and fight the claims that Mr. Samost has?
A. and to pursue our own claims.
Q. So, but – but you're willing to do the plan. Does that have anything to do with your willingness to get the creditors – the vendor creditors paid?
A. That's – that was one of the basis – basics for us. These are all people that we do work with. We don't want to see them hurt...

31

participants in the Debtors' bankruptcy case and filed papers in response to the Debtors' proposed Plan. Thus, this is not the case where the proposed releases and injunction will affect third parties who had no involvement in the Debtors' bankruptcy cases or are without notice of their affected rights.

The factual record supports "related to" jurisdiction and is readily distinguishable from those cases which have refused to exercise related to jurisdiction. For example, in *In re Combustion Engineering*, the Court held that the asbestos related personal injury claims asserted against the debtor and two other non-debtor entities arose from different products, involved different asbestos containing materials, and were sold to different markets. Moreover, any indemnification claims against the debtor resulting from a shared production facility would require another lawsuit to conceivably effect the bankruptcy estate. In *Pacor*, which involved a third party personal injury suit against a non-debtor for damages allegedly caused by the non-debtor product but manufactured by the debtor, the court found no "related to" jurisdiction because the primary action – *i.e.*, the suit between the two non-debtors – would not, itself, result in an indemnification claim against the debtor. See *Pacor*, 743 F.2d at 995 ("[t]he primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate ... at best, it is a mere precursor to the potential third party claim for indemnification."). In *Federal Mogul* – the court found no "related to" jurisdiction over independent claims against non-debtor automobile manufacturers even though their products were incorporated into debtor's asbestos products because the third-party claim would not directly result in liability for the debtor.

In contrast to the examples above, this court has "related to" jurisdiction to **consider** the appropriateness of the Plan and the Third Party Releases and Injunctions contained therein.[20] Whether or not said releases and injunction are appropriate under these circumstances is discussed more fully below.

> ii.  The Third Party Releases and Injunction of Non-Debtor Entities
> Are Not Appropriate Under Third Circuit Precedent

While this Court may have jurisdiction to consider the Third Party Releases and Injunction that are a part of the Debtor's proposed Plan, for this Court to enter such an injunction, it must also have the power pursuant to the Bankruptcy Code or any other applicable law, to grant the requested relief and issue the injunction and/or release in favor of the third party non-debtors. Unfortunately, the Debtors have been unable to prove, under applicable law, that the injunction and release in favor of the non-debtor third parties is appropriate in this case. Whether courts have the power to issue injunctions or grant third-party releases effectively discharging the liability of non-debtors centers primarily around varying interpretations of 11 U.S.C. §§105 and 524(e) of the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

---

[20] It should be remembered that subject matter jurisdiction and power are separate prerequisites to the court's capacity to act. Subject matter jurisdiction is the court's authority to entertain an action between the parties before it. Power under section 105 is the scope and forms of relief the court may order in an action in which it has jurisdiction. *Am Hardwoods, Inc. v. Deutsche Credit Corp (In re Am. Hardwoods, Inc.)*, 885 F.2d 621, 624-25 (9th Cir. 1989). See also *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 504 (E.D.Pa. 1989) ("Consequently, while a bankruptcy court may have jurisdiction to hear a dispute between non-debtors, it may lack the statutory authority to enter a particular type of relief, such as a non-debtor discharge"); accord *In re Dow Corning Corp.*, 255 B.R. 445, 476 (E.D. Mich. 2000), rev'd on other grounds, 280 F.3d 648 (6th Cir. 2002).

of this title." 11 U.S.C. §105(a).  Section 524(e) provides that "discharge of a debt of the debtor

does not affect the liability of any other entity on, or the property of any other entity for, such

debt." 11 U.S.C. §524(e).

On its face, paragraph 9.4 of the Plan conflicts with U.S.C. §524(e), which provides that a

debtor's discharge "does not affect the liability of any other entity ..." See *First Fidelity Bank v.*

*McAteer*, 985 F.2d 114, 118 (3d Cir. 1993).  The Debtors assert, however, that this court may

nonetheless approve a chapter 11 plan that includes a third party release pursuant to its authority

under 11 U.S.C. §105(a).  There may be an exception to §524(e)'s restriction in "extraordinary"

cases. See *In re Continental Airlines*, 203 F.3d 203, 212 (3d Cir. 2003).  It is presently unclear

whether such an exception exists in this Circuit, and if so, the conditions "under which non-

debtor releases and permanent injunctions are appropriate or permissible." *Id.* at 214; see also *In*

*re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331 (Bankr. E.D.Pa. 2010).  This Court finds it

unnecessary to decide that question in this case; for if it is permissible for a chapter 11 plan to

include a third party release, the release at issue in this case "does not pass muster under even the

most flexible tests for the validity of non-debtor releases." *Id.*

The most flexible test for non-debtor releases was articulated in *In re Saxby's Worldwide*

*Coffee*, 436 B.R. 331 (Bankr. E.D.Pa. 2010) citing *In re South Canaan Cellular Investments,*

*Inc.*, 427 B.R. 44 (Bankr. E.D.Pa. 2010):

> (1) whether the third party who will be protected by the injunction or
> release has made an important contribution to the reorganization; (2)
> whether the requested injunctive relief or release is "essential" to the
> confirmation of the plan; (3) whether a large majority of the creditors in
> the case have approved the plan; (4) whether there is a close connection
> between the case against the third party and the case against the debtor;
> and (5) whether the plan provides for payment of substantially all of the
> claims affected by the injunction or release.

34

436 B.R. at 331. See also *In re Exide Technologies*, 303 B.R. 48, 71-74 (Bankr.D.Del. 2003); *In re Zenith Electronics Corp.*, 241 B.R. 92, 110 (Bankr.D.Del. 1999).

Here, the Plan fails to meet several elements of the most "flexible test." As noted above, the Third Circuit has made it clear that in addition to anything paid by the debtor on the underlying claims, consideration for the release must be paid by the parties being released to the party being enjoined. *Continental*, supra, 203 F.3d at 214-215. In determining whether third party releases and/or injunctions are fair and made in exchange for fair consideration, the Court should not only consider whether the parties being released have provided a contribution to the bankruptcy estate, but also whether the third party releases are limited in scope to those matters involving the debtor and its business. See generally, *Skulnik v. Skulnik (In re United Steel Enters., Inc.)*, 2006 U.S. Dist. LEXIS 88997 (D.N.J. Dec. 6, 2006).

                    a.    <u>Fair Consideration</u>

The proposed Third Party Releasees have not given adequate consideration in exchange for the injunction and releases in their favor, as contemplated by the Plan. In the instant case, the Debtors' Plan provides for contribution by the "Settling Parties" of 25% of allowed class 5 claims up to $660,000, a payment of $40,000 by FC, voluntary subordination of the Class 6 claims of FCD and a Member Contribution for certain pre- and post-confirmation administrative expenses. In addition, the Plan provides for the Debtors' contribution of approvals to the Project to MVE, Laurel and/or Samost. The Debtors also note that the Settling Parties have already paid the Township $250,000 to settle the Township's claim and $325,000 to Pennoni in exchange for Pennoni's withdrawal of its objection to confirmation. Finally, the Debtors' Plan provides that the Members will contribute an additional $50,000 to the Debtors' estates in exchange for the

release and waiver by Debtor of all of the Project Causes of Action[21] against MVE, Laurel,

Samost and Lennar.  The Debtors allege that certain Project Causes of Action exist against MVE,

Laurel, Samost and Lennar, including RICO Complaint, and therefore, the Members'

contribution made in exchange for waiver of these claims, constitutes valuable consideration

given by the members to MVE, Laurel, Samost and Lennar.

The Movants allege that there will be inadequate consideration given by the third parties

being released to MVE, Samost, Laurel, Lennar, and/or Cubellis, and therefore they are

impermissible.  This Court agrees.  The Debtors put forth days of testimony regarding the alleged

Project Causes of Action, including the proposed RICO Complaint, and this Court is not

convinced that the Debtors' waiver of such tenuous litigation is satisfactory "consideration" for

the Third Party Releases and Injunctions.  Indeed, the RICO Complaint which was attached to the

Debtors' Plan names the Township as a proposed defendant, even though the Debtors agreed to

pay the Township $450,000 in satisfaction of its claim against the Debtors.  In addition, the

"predicate acts" that purportedly give rise to the RICO Complaint are alleged to have occurred

prior to the Debtors' entrance into the Stipulation in the MVE Litigation in June of 2005.  Courts

---

[21] A Complaint dated September 20, 2007 was filed in the State Court Litigation by certain of the Debtors against
MVE, Laurel, Samost and the Township alleging, *inter alia*, breaches of duty of good faith and fair dealing,
promissory estoppels, unjust enrichment, breaches of fiduciary duty and other causes of action arising from the
Project (the "Project Causes of Action").  On October 5, 2007, the State Court Judge entered an Order which, among
other things, dismissed the Debtors' Complaint and ordered "Freeco" to "immediately take all steps to consummate
the Agreement of Sale in Lieu of Condemnation between plaintiffs and the Township along with the remaining
Transaction Agreements, and to consummate at least the First Closing thereunder by October 31, 2007 at 4:00
p.m...."  See Exhibit D-14.  Prior to issuance of the Order dismissing the Debtors' Complaint and upon review of
various motions filed in the State Court litigation, the State Court Judge commented stated the following:
> "I am satisfied that an agreement between sophisticated business entities, all of which you are, are to submit
> disputes to a specific Judge or Judges for binding dispute resolution, which format clearly precludes further
> judicial review, is enforceable.... [t]hat lawsuit that was just filed, nobody ever talked to me about that [
> referring to the Debtors' Complaint]...[i]t contemplates something other than what the agreement of the
> parties contemplated, and I'm dismissing it accordingly."

See Exhibit D - 121, pp. 44-45.

interpreting both the Federal RICO Statute and the New Jersey RICO Statute have imposed a

four-year statute of limitations. See *County of Hudson v. Janisqeski*, 520 F.Supp. 2d 631, 640

(D.N.J. 2007).    In addition, conspiracy to violate the Federal RICO laws carries the same four

(4) year statute of limitations. *Davis v. Grusemeyer*, 996 F.2d 617, 626 (3d Cir. 1993).   While

this Court is not making any specific findings regarding the Debtors' proposed RICO Complaint,

it seems clear that the Debtors would face several hurdles, some likely insurmountable, in order

to succeed on their RICO claims against the parties named therein.   Such speculative success

cannot be the basis upon which this Court finds adequate consideration for the releases and

injunctions.   The other Project Causes of Action are similarly speculative in their outcome and

Debtors' waiver thereof (in exchange for the Second Member Contribution of $50,000) does not

constitute adequate consideration in this case.   As the Debtors are well aware, the Movants herein

have asserted various causes of action against the Debtors, their Members, and/or other related

non-Debtor entities which they have attempted or will attempt to prosecute in State Court.   So,

while the waiver of certain claims against the Movants may be of some value, it is clearly

diminished when one considers the counterclaims and cross-claims which have been or are likely

to have been asserted by the Movants herein.

It should also be mentioned that the above referenced RICO claim, in addition to any

other claims related to the Project which the Plan proposes to deal, may be subject to the

Summary Dispute Resolution Process noted above.   While this Court is not making a final

determination as to whether the Summary Dispute Resolution Process precludes this Court or any

other court from adjudicating the above referenced claims, this Court clearly recognizes that the

existence of the "Sweeney Clause" further gives rise to the speculative nature of claims to be

released by the Plan. It may very well be the case that the Project Causes of Action, the RICO

claims, and other claims related to the Project must be decided in accordance with the Summary

Dispute Resolution Process. Again, this Court fails to find adequate consideration based upon

claims allegedly released by Debtors' and related parties, which may very well be subject to a

summary dispute resolution process agreed to by those very same parties.

The Debtors also argue that the alleged claims of MCN and MCS to reimbursement rights

under the Transaction Agreements constitute consideration for the Third Party Releases and

Injunctions. The Movants argue, however, that the Reimbursement Rights, if any, are minimal

at best. Specifically, the Movants allege that the Reimbursement Rights, if any, of the Debtors

were narrowed when the Debtors advocated the narrowing of the term "benefit" in a letter brief

to Mr. Caton, the Court Appointed Master in the State Court Litigation. The letter brief

submitted by Debtors to Mr. Caton was meant to address the scope of an Order entered on

June 19, 2006 by Judge Sweeney regarding Pulte Home's rights to reimbursement for certain

costs and expenses. The Debtors specifically argued in their letter brief that

> "[i]n the context of the Court's Order, the term benefit means that Pulte
> should be required to prove that: (I) Pulte incurred actual out of pocket
> costs for specified engineering or other architectural planning work
> product for the final approved Project (excluding attorneys' fees), (ii) that
> Freeco is currently using that work product as part of the final approved
> Project, and (iii) that Freeco has achieved an identifiable costs savings as a
> result thereof after setting off against any such costs incurred by Pulte any
> costs incurred by Freeco for modifications to the plans or approvals
> resulting from Pulte no longer being the residential developer of the
> Project."

See Exhibit MVE-63. While the Debtors advocated the above position with respect to Pulte and

in the Court's June 19, 2006 Order, the Debtors' position in that context does not limit their

ability to argue that the reimbursement provisions contained in the Agreement of Sale in Lieu of

Condemnation is substantially more broad.  The provision of the Agreement of Sale in Lieu of

Condemnation specifically provides that

> MVE to retain and/or seek a Court Order that it owns any and all right,
> title, and interest in and to any plans, documents, approvals, information,
> leases, agreements or rights of any kind in and to the developments …
> subject to an obligation to reimburse [MCN/MCS/PT as Redeveloper] for
> agreed upon out of pocket costs and expenses, excluding attorneys fees."

See Exhibit D-16.  While this Court is not making any specific determination with respect to the

value of said reimbursement rights of the debtor, this Court does recognize that the Debtors may

have reimbursement rights for amounts greater or lesser than those asserted by the Movants

herein.  Regardless of the actual value of said reimbursement rights and possible value of the

Project Causes of Action, this proposed exchange cannot serve as a basis for this Court to find

adequate consideration for such sweeping releases.  It may very well be that the Debtors are not

entitled to the breadth of reimbursement rights that they allege, or it may be that said rights are

significantly limited by the position they took with respect to Pulte.  It remains the case, however,

that this Court will refuse to find that a waiver of Debtors' Reimbursement Rights, in any

amount, are sufficient consideration in exchange for the third party releases and injunctions

contemplated in the Plan.

Finally, with respect to the contribution of approvals by certain Debtors to the Project,

this Court also finds that the values thereof are insufficient and/or so speculative that they cannot

serve as a basis for adequate consideration in exchange for the releases and injunction.  It should

also be noted that, subsequent to the filing of the Plan, the Debtors and related parties entered

into a Settlement Agreement with Pennoni in which all right, title and interest in and to the

engineering plans was recognized to be held by Pennoni, not by the Debtors or any of their

affiliates.  The Movants have raised doubts as to whether the Project Approvals can have any

value in the absence of the engineering plan on which they are based.  To be clear, this Court is

not making a specific factual finding on the valuation of the Project Approvals, however, this

Court does recognize that their value is speculative at best, and cannot serve as the basis for

adequate consideration in exchange for such sweeping releases and injunctions.

> b.    The Third Party Releases and Injunction Are Necessary
> for the Debtor's Liquidating Plan of Reorganization

The Debtors allege that the Third Party Releases and Injunctions are necessary to the

Debtors' Plan because without the Member Settlement (which will only be funded by the

Members with the inclusion of the Third Party Releases and Injunctions) the Debtors will neither

be able to confirm their Plan nor make any distributions to creditors.  The Movants allege,

however, that the Third Party Releases and Injunctions are not necessary to the Plan because the

Debtors' Plan is a liquidating plan.  The Movants allege that the "necessary for reorganization"

element focuses on the necessity of the release to the business moving forward as a going

concern, and because the Debtors intend to liquidate, this element is inapposite.  This Court finds

that the Debtors' Plan of Reorganization may founder without the proposed Member

Contributions and corresponding Third Party Releases and Injunction.  However, the necessity of

the releases and injunctions for the Debtors' reorganization does not overcome the impermissible

nature of the releases in this context.  The question of necessity requires demonstration that the

success of the debtors' reorganization bears a relationship to the release of the non-consensual

parties, and that the releasees have provided a critical financial contribution to the debtor's plan

that is necessary to make the plan feasible in exchange for receiving a release of liability.  In *re*

*Continental Airlines*, 203 F.3d at 214, 215.

In the instant case, the Debtors have demonstrated that, but for the Member Contributions, the proposed Plan would remain unfunded. The Members have conditioned their contributions on the ability to obtain the Third Party Releases and Injunctions. Thus, the Plan will not succeed without the contemplated Third Party Releases and Injunction. While this Court recognizes that this is a "liquidating plan" as pointed out by the Movants, the Court also appreciates that unsecured creditors will receive substantially more under the Plan than they would in a Chapter 7 liquidation of Debtors' assets. Furthermore, this Court appreciates the noble attempts by the Debtors to achieve a global resolution in the Plan of the various disputes and controversies that have plagued this Project from its inception. Despite the legitimate goals of the Plan and the necessity of the Member Contributions to fund it, this Court cannot ignore the fact that there is inadequate consideration given by the Debtors in exchange for the Third Party Releases and Injunction.

This analysis mandates the denial of confirmation of the Debtor's plan. The general unsecured creditors would receive a modest distribution under the Plan and several other classes of creditors objecting to the Plan will receive nothing. The parties that would be restrained from proceeding against the Third Party Releasees are receiving little or no distribution under the Plan and would be precluded from asserting their claims against the Releasees. If the Plan were confirmed, the rights of the restrained parties effectively would be nullified without the requisite commensurate benefit to them under the Plan.

For the foregoing reasons, this Court finds that the Third Party Releases and Injunctions are impermissible and cannot be confirmed as part of the Debtors' Chapter 11 Plan of

Reorganization as contemplated.  As noted above, in light of my denial of confirmation on these

grounds, it is unnecessary to reach the other issues raised by the Movants herein.


BY THE COURT:

GLORIA M. BURNS
United States Bankruptcy Judge

42